UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICHARD L. WENDT REVOCABLE LIVING TRUST, | CASE NO. C23-5359 |
| Plaintiff / Counter-Defendant, | ORDER |
| v. | |
| CHURCHILL & COMPANY2 LLC, | |
| Defendant / Counter-Claimant. | |

## I.  INTRODUCTION

Before the court is Plaintiff / Counter-Defendant Richard L. Wendt Revocable Living Trust's motion for partial summary judgment and declaratory judgment.  Dkt. 32, MSJ; Dkt. 43, Reply.  Defendant / Counter-Claimant Churchill & Company2 LLC opposes the Trust's motion.  Dkt. 36.  The court **GRANTS in part** and **DENIES in part** the Trust's motion for partial summary judgment and declaratory judgment.

1

## II.  BACKGROUND

2

Friends do not always make the best business partners.  The present dispute arises

3

out of a friendship-turned-business-venture gone awry.  In February 2015, longtime

4

friends Roderick Wendt, the Trustee for the Trust,[1] and Craig Churchill formed Pelican

5

Capital, LLC (Pelican) to invest in residential construction loans in partnership with

6

Churchill & Company2, LLC (Churchill), a company Mr. Churchill had formed in 2013.

7

Dkt. 34, Wendt Decl. ¶ 4; Dkt. 37, Churchill Decl. ¶¶ 4, 9, 14.

8

The parties retained attorney Daniel Vaughn to prepare Pelican's corporate

9

formation and operating documents.  Churchill Decl. ¶ 14; Dkt. 40, Vaughn Decl. ¶¶ 5-6.

10

On February 13, 2015, the parties executed the Limited Liability Company Agreement of

11

Pelican Capital, LLC (Operating Agreement). Wendt Decl. ¶ 4, Ex. A, Op. Ag.[2]

12

Churchill served as manager of Pelican.  Wendt Decl. ¶ 3.  Because the Trust was the

13

largest investor in Pelican, the Operating Agreement granted the Trust management

14

rights, including the right to review and approve certain Pelican transactions and the right

15

to remove the Manager for cause.  *Id.* ¶ 5; Dkt. 34-1, Op. Ag. §§ 4.1, 4.3.

16

17

18

[1] Mr. Wendt serves as co-Trustee of the Trust with his brother, Mark Wendt.  Dkt. 39,
Selby Decl. ¶ 3, Ex. B, Wendt Dep., at 21:22-23.  Mr. Wendt's son, Matt Wendt, served as "the
Trust's primary point of contact with Churchill regarding Pelican."  Dkt. 34, Wendt Decl. ¶ 2.
Matt Wendt "never had final decision making authority for the Trust."  Wendt Dep. at 28:19-22.

19

20

[2] The parties prepared an amended version of the Operating Agreement later in 2015. *See*
Wendt Decl. ¶ 4 n.1, Ex. C.  However, the amended version was not executed, and the parties
have indicated that the court should rely on the February 13, 2015, Operating Agreement for
purposes of resolving this motion.  *See* Wendt Decl. ¶ 4 n.1 (stating "the provisions at issue . . .
are substantively the same").

21

22

1        The Operating Agreement created two classes of investors—Class A Economic

2   Interest Owners and Class B Economic Interest Owners.  Dkt. 34-1, Op. Ag. § 3.1; *see*

3   *also* Churchill Decl. ¶ 11.  Class A Economic Interest Owners were "entitled to [a]

4   Preferred Return payable quarterly to the extent of available Net Cash from Operations."

5   *See* Op. Ag. § 3.1(a).  They were additionally entitled to a priority return of capital upon

6   liquidation. *Id*., *see also* Wendt Decl. Ex. B at ii. Class B Economic Interest Owners—of

7   which the Trust was the primary holder—were "entitled to a pro rata portion of Net Cash

8   from Operations."  *Id.* § 3.1(b); Wendt Decl. ¶ 12.  The Trust contributed approximately

9   $6.2 million in capital to Pelican as a Class B Economic Interest Owner.  Wendt Decl. ¶

10  7; *see also* Churchill Decl. ¶ 13.  Mr. Churchill asserts that the parties intended that the

11  Class B Economic Interest Owners would bear the risk of any losses incurred by Pelican.

12  Churchill Decl. ¶¶ 11, 12, 20; Wendt Dep. at 75:5-7 (stating that "everybody else other

13  than" the Class A Economic Interest Owners bore the risk).

14        According to Mr. Churchill, the parties were "rushed" to finalize the Operating

15  Agreement.  Churchill Decl. ¶ 14; *see also* Vaughn Decl. ¶ 8 ("I characterize the process

16  in which I prepared documents for Pelican Capital as rushed.").  Mr. Churchill admits

17  that he did not closely read the Operating Agreement before signing it because he

18  "trusted [Mr.] Wendt to administer the Trust consistent with [the parties'] agreement."

19  Churchill Decl. ¶ 16. After executing the Operating Agreement, the parties continued to

20  engage in discussions to prepare the Private Placement Memorandum (PPM).  Dkt. 40,

21  Vaughn Decl. ¶ 10.  The PPM was "intended as an offering to invest in Pelican Capital."

22  *Id.* ¶ 13.  According to Mr. Vaughn, the PPM was to "be read in conjunction with the

1  Operating Agreement," as it provided information to prospective investors about

2  Pelican's planned operations, investment structure, and the risk of investing in the

3  company. *Id.* ¶¶ 10, 13.

4      On March 18, 2015, Pelican agreed to fund real estate construction loans for

5  homebuilders that were unable to obtain financing from banks through Construction Loan

6  Services, LLC d/b/a Builders Capital ("Builders Capital"), an investment platform that

7  originated, underwrote, and administered construction loans using funds invested by

8  investors like Pelican.[3]  Churchill Decl. ¶¶ 9, 11; Wendt Decl. ¶ 8.  Mr. Churchill asserts

9  that "[t]he Pelican structure was designed and agreed upon for [the] Builders Capital

10  [venture], specifically."  Churchill Decl. ¶ 25.

11      In 2020, Pelican initiated an arbitration action against certain Builders Capital's

12  affiliates seeking distribution of funds Pelican believed it was owed.  Wendt Decl. ¶¶ 9-

13  10.  At the end of 2021, the arbitrator issued an award in favor of the Builders Capital

14  affiliates.  *Id.* ¶ 12; Churchill Decl. ¶ 20.  Pelican paid the award in January 2022 and

15  sustained losses as a result.  Wendt Decl. ¶ 9; Resp. at 10.

16      In February 2021, while the arbitration was pending, Churchill—through

17  Pelican—invested $4 million in Sound Equity, a separate entity.  Dkt. 34, Wendt Decl.

18  ¶ 13; Dkt. 33, Roller Decl. ¶ 9, Ex. H (Craig Churchill Dep.) at 135:4-6, 173:4-7,

19  181:9-24.  The Wendts declined to invest any Trust funds in Sound Equity, Churchill

20

21      [3] It is not clear from the record when the PPM was completed.  Churchill's Response,
    however, indicates that the "parties were still working . . . to clarify the Operating Agreement
22  and PPM" as of March 10, 2015—the week before the parties entered into the transaction with
    Builders Capital.  Resp. at 10.

ORDER - 4

1   Decl. ¶ 23, and according to Mr. Churchill, Builders Capital had not been investing

2   Pelican's funds "since before 2022," Resp. at 12-13.  Therefore, Mr. Churchill asserts,

3   the parties' business venture had effectively terminated around 2022.  *See* Churchill Decl.

4   ¶¶ 23-24.  The Trust disagrees.  *See generally* Mot.; Reply.

5          The Trust asserts that after the arbitration proceedings, Churchill materially

6   breached the Operating Agreement by (1) improperly allocating all of the losses to the

7   Class B Economic Interest Owners (the Trust); (2) improperly redeeming the Trust's

8   interests in Pelican without prior notice to the Trust; (3) transferring substantially all of

9   Pelican's assets to Sound Equity without obtaining prior approval from the Trust; and (4)

10  failing to distribute 2022 profits to the Class B Economic Interest Owners.  Mot. at 16.

11  On December 16, 2022, the Trust sent a letter to Churchill asserting that Churchill had

12  materially breached the Operating Agreement and invoking its right to remove Churchill

13  as Manager of Pelican in accordance with § 4.3 of that Agreement.  Wendt Decl. ¶ 16,

14  Ex. E (citing Op. Ag. § 4.3).  The Trust provided Churchill 60 days to cure the identified

15  breaches by providing a detailed accounting for Pelican between 2019 and 2022.  *Id.*

16  Churchill responded in a letter dated February 27, 2023.  Wendt Decl. ¶ 16, Ex. F.

17  Churchill stated that it "disagree[d]" with the assertions the Trust made in its December

18  2022 letter and enclosed financial documents, including Sound Equity statements, Pelican

19  profit and loss summaries, and Pelican's Schedule K-1.  *Id.*  According to the Trust,

20  however, the enclosed documents "demonstrated Churchill's ongoing breaches of the

21

22

1   Operating Agreement."[4]  Mot. at 12.  Mr. Churchill testified that Churchill did not take

2   any action to cure the identified breaches after receiving the Trust's letter.  Craig

3   Churchill Dep. at 217:25-221:23.

4          On March 29, 2023, counsel for the Trust sent another letter notifying Churchill

5   that the Trust had removed Churchill as Manager of Pelican.  Wendt Decl. ¶ 17, Ex. G.

6   The Trust also sent an amendment to the Operating Agreement reflecting Churchill's

7   removal and electing Spruce Street Management, LLC as the new Manager of Pelican.

8   Wendt Decl. ¶ 17.  Churchill did not acknowledge or sign the amendment.  Roller Decl. ¶

9   3.

10         On April 24, 2023, the Trust commenced this lawsuit.  *See* Dkt. 1, Compl. In the

11  weeks before the lawsuit, Churchill formed Raven Capital, LLC, transferred the

12  remaining investment capital from Pelican to Raven, and reinvested those funds in Sound

13  Equity.  *See* Roller Decl. ¶ 8, Ex. G; Craig Churchill Dep. at 186:9-187:7.

14         The Trust filed the pending motion on August 20, 2024.  The Court first addresses

15  the Trust's motion for partial summary judgment on its breach of contract claim before

16  turning to the Trust's motion for summary judgment on its declaratory judgment claim.

17                                    **III.  ANALYSIS**

18         The Trust's Complaint pleads breach of contract.  *See generally* Dkt. 1.

19  Washington law governs these claims.  *See* Op. Ag. § 11.2.  Below, the Court sets forth

20

21         [4] Specifically, the Trust states that these documents "showed Churchill taking additional
    profit shares (but providing nothing to the Trust and not accounting for legal expenses or loan
22  losses)" and "showed all losses from the Builders Capital debacle assigned to the Trust."  Mot. at
    12.

the summary judgment legal standard before turning to the merits of the Trust's motion for partial summary judgment.

**A.    Summary Judgment Legal Standard**

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for" the nonmoving party.  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).  Courts must "view the facts and draw reasonable inferences in the light most favorable" to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and citation omitted).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Id*. at 324; *Anderson*, 477 U.S. at 250.  To defeat a summary judgment motion, the nonmoving party "must present significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)).

**B.    Breach of Contract Claim**

To establish a claim for breach of contract, the plaintiff must show that a contract exists, that the contract imposes a duty, that the defendant breached that duty, and that the breach proximately caused damage to the plaintiff.  *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995).

In interpreting contracts, Washington courts "focus[] on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). The court assigns terms in the agreement "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* (citing *Universal/Land Constr. Co. v. City of Spokane*, 745 P.2d 53, 55 (Wash. Ct. App. 1987)). If the terms of a contract are unambiguous, the court must "enforce [the contract] as written[.]" *Radliff v. Schmidt*, 532 P.3d 622, 625 (Wash. Ct. App. 2023).  Extrinsic evidence may be used only "to determine the meaning of *specific words and terms used*" in the agreement and "not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'" *Hearst*, 115 P.3d at 267, 270 (citation omitted).  In other words, the court "do[es] not interpret what was intended to be written but what was written." *Id.* at 267.

The parties do not dispute the validity of the Operating Agreement or the PPM. (Reply at 3; *see generally* Resp.)  Instead, the Trust argues that the "undisputed facts" show that Churchill breached the Operating Agreement by:

(1)    failing to allocate losses as called for in [the Operating Agreement];

(2)    redeeming certain of the Trust's interests in Pelican without giving prior written notice [to the Trust];

(3)    transferring substantially all of Pelican's assets without obtaining prior approval from the Trust; and

(4)    paying itself a profit share in 2022, but paying no such share to the Trust, despite [the Trust's] entitlement to [68.15%] of post-Preferred Return Net Cash from Operations.

Mot. at 1-2.  Churchill contends that "there is a genuine issue of material fact as to whether" it committed the alleged breaches because the Operating Agreement, when "read in conjunction with the [PPM]," shows that Churchill did not commit the alleged breaches.  Resp. at 2, 8. The Trust disputes that the language of the PPM supports Churchill's position.  Reply at 7-8, 12.  The court considers each of the asserted breaches below.

1.    The Loss Misallocation Claim

The Trust first alleges Churchill misallocated the losses Pelican incurred in 2021 exclusively to the Class B Economic Interest Owners.  Mot. at 16-17.  The Trust directs the court to § 6.1(c) of the Operating Agreement, which provides that the "net loss for any fiscal year shall be allocated among the Economic Interest Owners pro rata in accordance with their respective Percentage Interests." *Id.* (quoting Op. Ag. § 6.1(c)). The Trust posits that this term "explicitly call[ed]" for Churchill to allocate each fiscal year's losses, if any, "by the percentage interests of *all* Economic Interest Owners," rather than to Class B Economic Interest Owners only.  Reply at 4.  Churchill counters that § 6.1(c) is "ambiguous in that [the term] 'Economic Interest Owners' could be

1  interpreted as Class A Economic Interest Owners, Class B Economic Interest Owner[s],

2  or both."  Resp. at 19.

3       To resolve this dispute, the court begins and ends with the plain language of the

4  Operating Agreement.  *See Hearst*, 115 P.3d at 267.  As stated, the Operating Agreement

5  allocates net losses "among the Economic Interest Owners pro rata in accordance with

6  their respective Percentage Interests."  Op. Ag. § 6.1(c).  "Economic Interest Owner" is

7  expressly defined in the Operating Agreement as "an owner of a Class A or Class B

8  Economic Interest who is not a Member."  Op. Ag. art. 1, at 2.  The court agrees with the

9  Trust that "Economic Interest Owner," as used in § 6.1(c), "do[es] not distinguish

10 between the two classes of [E]conomic [I]nterest [O]wners."  Reply at 5.

11      Churchill submits that its interpretation of § 6.1(c) stems from "the parties'

12 statements and actions."  Resp. at 19.  Such extrinsic evidence, however, can be used

13 only to interpret specific terms—it cannot be used to "contradict" the plain meaning of

14 the Operating Agreement.  *See Hearst*, 115 P.3d at 267, 270.  Churchill also states that its

15 "negotiations" and "communications" with the Wendts related to the Operating

16 Agreement and PPM "ma[k]e clear that . . . Class B Economic Interest Owners [*i.e.*, the

17 Trust] [would bear] the risk of loss."  Resp. at 20.  But negotiations preceding the

18 drafting of the Operating Agreement and after-the-fact emails are exactly the kind of

19 extrinsic evidence that cannot be used to "vary, contradict, or modify" unambiguous

20 terms in the agreement.  *Hearst*, 115 P.3d at 267; *see also id.* at 270 (holding that

21 extrinsic evidence about the parties' intent was "irrelevant" when the language of the

22 agreement was clear).

1    The "representations in the PPM" also do not change the court's analysis.  *See*

2    Resp. at 19.  Churchill relies on the following language in the PPM:

3        To ensure that the Class A Economic Interests have an equity cushion
         beneath them, the Company intends to maintain an amount of Class B
4        Economic Interests that in the aggregate is no less than the initial capital
         commitment of $6,000,000.

5
6    Resp. at 21 (quoting PPM at 40).  Churchill contends that this language reflects the

7    "parties' intention" that Class B Economic Interest Owners would shoulder the entire risk

8    of loss.  *See* Resp. at 21; *see also* Churchill Decl. ¶ 19.  The Court disagrees.  That

9    Pelican represented that it "intend[ed]" to ensure that the Class A Economic Interests had

10   an "equity cushion" by "maintaining" sufficient Class B Economic Interests does not

11   indicate that potential future losses would be allocated exclusively to Class B.  This

12   language does not render the Operating Agreement ambiguous.  At best, Churchill's

13   argument is an attempt to use the PPM to contradict the mercifully clear loss allocation

14   language in the PPM. That effort fails.

15       Churchill also asserts that allocating the risk of loss among both the Class A and

16   Class B Economic Interest Owners is "nonsensical."  *See* Churchill Decl. ¶ 19.  He

17   elaborates that it would make no sense for "the Class A Economic Interest Owners agree

18   to cap their return if they would bear risk of loss on a pro rata basis with Class B[.]" *Id*.

19       This argument too fails to overcome the plain terms of the loss allocation in the

20   Operating Agreement.[5] The Court must "not interpret what was intended to be written but

21
22   ───────────────────
     [5] It additionally fails to account for the fact that Class A Interests were senior in priority
     to the Class B interests in the event of liquidation. Op. Ag. §§ 3.1 (a), 7.1.2, 8.2.

1    what was written" in the contract.  *Hearst*, 115 P.3d at 267.  It bears noting that both

2    parties here are sophisticated. Indeed, Mr. Churchill has worked in financial services for

3    39 years. Churchill Decl. ¶ 5.  It should come as no surprise that he is bound by the

4    unambiguous terms of the Operating Agreement that he signed.  Accordingly, the Court

5    concludes, as a matter of law, that Churchill breached the Operating Agreement by

6    allocating a disproportionate amount of losses to the Class B Economic Interest Owners.

7         A breach is "material" if it "'substantially defeats' a primary function of an

8    agreement." *224 Westlake, LLC v. Engstrom Props., LLC*, 281 P.3d 693, 707 (Wash. Ct.

9    App. 2012).  The Trust asserts that Churchill's misallocation of losses to the Class B

10   Economic Interest Owners was a "material" breach because it "enabled Churchill's

11   improper redemption of the Class A Economic Interest Owners' units at amounts higher

12   than warranted," because Class A did not sustain any losses from the Builders Capital

13   arbitration award.  Mot. at 19.  Churchill disputes the materiality of this breach, asserting

14   that "[b]ecause the contract, itself, is ambiguous, the question of materiality cannot yet be

15   determined."  Resp. at 24.  According to the parties' briefing, the mechanism for

16   allocating losses was a "primary function" of the contract that was vigorously negotiated.

17   *224 Westlake, LLC*, 281 P.3d at 707; *see* Mot. at 16-17; Resp. at 19-21; Reply at 4-8.

18   Accordingly, Churchill's misallocation of losses constituted a material breach of the

19   Operating Agreement as a matter of law.  The Trust is therefore entitled to summary

20   judgment on this claim.

21        2.    The Interest Redemption Claim

22        Second, the Trust alleges that Churchill breached the Operating Agreement by

1  sending $178,000 to the Trust in July 2022 as "a redemption of the Trust's remaining

2  cash interest in Pelican." Mot. at 17. The Trust argues this action was invalid because

3  the Trust did not receive "thirty (30) days prior written notice" of the proposed

4  redemption as required under § 3.4 of the Operating Agreement. *Id.* at 17-18. Churchill

5  counters that the Operating Agreement granted it the "sole discretion" to "redeem any

6  [E]conomic [I]nterest [O]wner's capital investment." Resp. at 13.

7        Churchill's position contravenes the plain text of the Operating Agreement.

8  Section 3.4 of the Operating Agreement authorizes the Manager to "redeem the interests

9  of any Economic Interest Owner *after* providing" written notice. Op. Ag. § 3.4

10  (emphasis added). This language unambiguously requires the Manager to provide 30

11  days' written notice before redemption. Churchill does not dispute that it failed to

12  provide such notice. *See generally* Resp. Therefore, the court concludes that Churchill

13  breached the Operating Agreement by redeeming the Trust's interests without providing

14  written notice.

15        Churchill asserts that the "parties' [past] communications and conduct"

16  demonstrate that Matt and Roderick Wendt had previously "orally *requested* [that]

17  Churchill redeem the other Class B Economic Interests in the years preceding" the

18  disputed redemption. Resp. at 22. Not only does this claim contradict the record,[6] such

19  facts—even if true—would not provide a basis for Churchill to evade the clear noticing

20

21        [6] Churchill claims that it honored two "telephone" redemption requests for the Wendts in
2018 and 2020, "even though [the requests] were not made in writing." *Id.* at 11-12, 22; *see also*

22  Churchill Decl. ¶ 21. With its Reply, however, the Trust produced two emails showing that both
requests were in fact made in writing. Dkt. 44, Wendt Reply Decl. ¶ 2, Exs. A-B.

ORDER - 13

1  instructions directed to the Manager in § 3.4 of the Operating Agreement.  Churchill

2  breached the Operating Agreement by failing to provide written notice in accordance

3  with § 3.4 before redeeming the Trust's interests.

4        Churchill also asserts that the notice procedures of § 3.4 were not necessary

5  because the Trust "accepted" the $178,000 redemption over the telephone.  Resp. at 21;

6  *see also* Churchill Decl. ¶ 21 ("Upon wiring the funds, [Mr. Churchill] telephoned [Mr.

7  Wendt] and told him that [Churchill] had returned the money.  [Mr. Wendt] thanked [Mr.

8  Churchill] for doing so[.]").  The Trust does not dispute that this telephone call occurred.

9  *See generally* Mot., Reply.  Thus, construing the evidence in the light most favorable to

10 Churchill, the court cannot conclude that this breach is material as a matter of law.  *Scott*,

11 550 U.S. at 378.  Accordingly, the Trust is not entitled to summary judgment on this

12 claim.

13        3.    The 2023 Transferred Assets Claim

14        The Trust next alleges that Churchill breached the Operating Agreement by

15 "withdraw[ing]" funds from Pelican, redeeming those funds to the Class A Economic

16 Interest Owners, and reinvesting those funds into the newly formed Raven entity, all

17 without the Trust's approval. Mot. at 18; Reply at 9.  The Trust directs the court to § 4.1

18 of the Operating Agreement, which provides that

19        [n]otwithstanding any language to the contrary in this Agreement, including
         authority expressly delegated to the Manager under Section 4.1 above, []
20       [the] below [actions] shall require the prior approval of [the Trust]:

21       (a)    The  sale,  transfer,  conveyance,  or  other  disposition  of  all  or

22

1     substantially all of [Pelican]'s assets[.]

2    Mot. at 18 (citing Op. Ag. § 4.1).  The Trust contends that Churchill's withdrawal of

3    Pelican's funds and subsequent reinvestment of those funds into Raven constituted a

4    "transfer" of "substantially all" of Pelican's assets within the meaning of § 4.1.  *Id.*

5         Churchill counters that it did not breach the Operating Agreement when it

6    transferred the funds because the term "assets," as used in § 4.1, is ambiguous.  Resp. at

7    22-23.  When interpreting undefined terms in a contract, courts apply the plain, ordinary

8    meaning of the term unless the agreement clearly evidences a different intent.  *Hearst*,

9    115 P.3d at 267.  As relevant here, Black's Law Dictionary defines "assets" as "item[s]

10    that [are] owned and ha[ve] value," *Asset*, *Black's Law Dictionary* (12th ed. 2024), and

11    Merriam-Webster defines it as "the items on a balance sheet showing the book value of

12    property owned," *Asset*, *Merriam-Webster*, https://www.merriam-

13    webster.com/dictionary/asset [https://perma.cc/U9RE-DJF5] (last visited Sept. 25, 2024).

14    Applying these definitions to § 4.1, the Court agrees with the Trust that the term "assets"

15    is unambiguous and that the funds "contributed to Pelican by Economic Interest Owners"

16    and subsequently withdrawn by Churchill were "assets" of Pelican.  *See* Reply at 10.

17         Churchill also argues that the transferred funds were not Pelican's "assets."  Resp.

18    at 22.  Specifically, Churchill contends that the "assets" of Pelican were the "loans

19    [Pelican] funded" through Builders Capital, not "capital investments" contributed by the

20    Economic Interest Owners.  *Id.*  The face of the Operating Agreement does not

21    distinguish between loans and capital investments for purposes of § 4.1.  *See generally*

22

Op. Ag.[7]  Churchill, however, derives its claimed distinction from § 3.4, which grants the Manager "sole discretion" to redeem Economic Interest Owners' capital investments but does not mention loans.  *See* Resp. at 22 (quoting Op. Ag. § 3.4).  But the fact that § 3.4 gives the Manager discretion to *redeem* investments with notice does not mean that the Manager can *transfer* investments and other assets without prior approval from the Trust. In short, § 3.4 has no bearing on the plain language of § 4.1.  *See* Op. Ag. §§ 3.4; 4.1.

Because the court finds that "asset" as used in § 4.1 is unambiguous, it must "enforce [the contract] as written."  *Radliff*, 532 P.3d at 625.  Accordingly, the court concludes that the Trust has met its burden to show, as a matter of law, that Churchill breached the Operating Agreement by transferring assets out of Pelican without the Trust's prior approval.  The Trust has produced undisputed evidence that the breach is material because the Trust "negotiated to have robust management rights" to protect its position as Pelican's largest investor.  Wendt Decl. ¶ 3; *see generally* Resp. (citing no evidence countering the Trust's position on materiality).  The court therefore grants summary judgment on the transferred assets claim in favor of the Trust.

4. The Net Cash Distribution Claim

Finally, the Trust argues that Churchill breached the Operating Agreement by

---

[7] The court acknowledges that the Operating Agreement defines "Capital Contribution" as "the amount contributed by [an] Economic Interest Owner or Member to the capital of the Company" and "Loan" as "one or more secured real estate loans to one or more borrowers . . . upon terms and conditions acceptable to the Manager in its discretion."  Op. Ag. art. 1 at 1, 3; *id.* art. 2, at 5.  These definitions do not change the court's analysis, as the Operating Agreement does not distinguish between Capital Contributions and Loans for purposes of the § 4.1(a) "transfer" provision.  *See id.* § 4.1(a).

1  failing to pay the Trust its contractual share of 2022 Net Cash from Operations (Net

2  Cash).  *See* Mot. at 18-19.  The parties do not dispute that Churchill distributed Net Cash

3  to the Class A Economic Interest Owners and paid the remaining Net Cash to itself.  *See*

4  Mot. at 18-19; *see* Resp. at 23.[8]  Churchill, however, argues that the Trust was not

5  "entitled" to any Net Cash in 2022.  Resp. at 23.

6      Section 7.1.1 of the Operating Agreement outlines the process for allocating Net

7  Cash from Operations among the Economic Interest Owners and the Manager.  Under

8  that section, Net Cash must be distributed in accordance with the following "waterfall"

9  scheme:

10      (a)     First, to repay any Guaranty Advance,

11      (b)     Second, to the Class A Economic Interest Owners (pro rata in
        accordance with their respective accrued and unpaid cumulative but non-
12      compounding Preferred Return), until each Class A Economic Interest
        Owner has received aggregate distributions under this Section 7.l.l(a) in an
13      amount that is equal to (but does not exceed) such Economic Interest
        Owner's accrued and unpaid cumulative but non-compounding Preferred
14      Return through the date of the distribution,

15      (c)     Third, sixty-eight and 15/100 percent (68.15%) of any remaining Net
        Cash from Operations to the Class B Economic Interest Owners (pro rata in
16      accordance with their respective Class B Percentage Interest, and pro rata in
        accordance with the period of time during which such Economic Interest
17      Owner held such Percentage Interest vis-à-vis the period of time for which
        such Distribution of Net Cash from Operation is attributable), and the
18      remaining thirty-one and 85/100 percent (31.85%) to the Manager. The
        Member and Economic Interest Owners acknowledge that [Pelican] is
19      obligated to pay [Builders Capital] 32.5% of the profits from Loans
        following payment of expenses and the Preferred Return owing to the Class

20

21  ───────────────
    [8] The parties dispute the amount that Churchill paid itself—the Trust alleges the figure is
    $600,000, while Churchill alleges the figure is $388,562.42.  *Compare* Mot. at 19, *with* Resp. at
22  23.  Because the parties have reserved the issue of damages for trial (*see* Mot. at 11 n.4), the
    court need not resolve this dispute at this stage.

1        A Economic Interest Owners.

2   Op. Ag. §§ 7.1.1(a)-(c).  The Trust argues that "Churchill threw this formula out the

3   window" by failing to distribute to the Trust 68.15% of the funds that remained following

4   the distribution of the Class A Economic Interest Owners' Preferred Return.  Mot. at 11,

5   19.

6        Churchill counters that because the 2022 Net Cash was "generated" by "funds

7   invested in Sound Equity," rather than in Builders Capital, the Trust was not "entitled to a

8   share of the profits" because the Operating Agreement was "inextricably linked" to the

9   Builders Capital investments.  Resp. at 23-24.  Therefore, according to Churchill, the

10  waterfall scheme did not govern distributions of Net Cash in 2022.  *Id.*

11       The plain language of the Operating Agreement does not support Churchill's

12  narrow interpretation of § 7.1.1.  Setting aside that the Operating Agreement

13  contemplates Pelican's broad "purpose" as "mak[ing] one or more secured real estate

14  loans to *one or more borrowers*[9]" as opposed to only Builders Capital, § 7.1.1 provides

15  that "[d]istributions of Net Cash from Operations *shall* be made" in accordance with the

16  waterfall scheme, subject only to two exceptions inapplicable to the parties' case.  Op.

17  Ag. § 7.1.1 (emphasis added).[10]  The Operating Agreement defines "Net Cash from

18  Operations" as "*the gross cash proceeds from [Pelican] operations* less the portion

19

20

---

[9] Op. Ag. § 2.3 (emphasis added); *see also* Reply at 12

21  [10] Specifically, § 7.1.1 provides that distributions do not follow the provided scheme in
the case of Pelican's liquidation pursuant to §§ 7.1.2 and 8.2.  Op. Ag. § 7.1.1.  The parties agree
that Pelican was not liquidated, therefore those sections are irrelevant to this dispute.  *See* Mot. at

22  16-17; Roller Decl., Ex. H at 189:1-10, 190:4-6.

ORDER - 18

1    thereof used to pay or establish Reserves." Op. Ag. art. 1 at 3 (emphasis added). That

2    definition does not distinguish between profits generated from Builders Capital versus

3    Sound Equity investments. Rather, "[Pelican] operations" contemplates the inclusion of

4    proceeds generated from *any* Pelican business operation. *See id.* Applying this definition

5    to § 7.1.1 reveals the clear command of the Operating Agreement that all Net Cash

6    generated from Pelican operations be distributed according to the waterfall scheme.

7        Churchill argues that the last clause of § 7.1.1(c) supports its theory that the Trust

8    was not entitled to any Net Cash. That clause provides that "[Pelican] is obligated to pay

9    [Builders Capital] 32.5% of the profits from Loans following payment of expenses and

10   the Preferred Return owing to the Class A Economic Interest Owners." Op. Ag.

11   § 7.1.1(c). In Churchill's view, this clause shows that the waterfall scheme is "flawed"

12   "[w]ith Builders Capital out of the picture," and therefore the scheme "no longer

13   governed" Churchill's 2022 distribution. Resp. at 23. The court disagrees. While the

14   clause provides an additional level of distribution in the waterfall scheme with respect to

15   profits generated specifically from Builders Capital Loans, it does not by its plain terms

16   discard the waterfall scheme when profits are generated by investments in funds other

17   than Builders Capital.

18       Churchill also argues that the Trust is not entitled to any Net Cash generated from

19   Sound Equity investments under the waterfall scheme because "the Trust had abandoned

20   Pelican and declined to invest in Sound Equity" and therefore could not "share [those]

21   profits." Resp. at 23. Churchill, however, does not point to any language in the operative

22   documents that restricts investors' interests in Pelican to a particular borrower or fund.

1 | *See generally id.*  In sum, Churchill has not identified "specific facts" to support its

2 | interpretation.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S at 250.  The court therefore

3 | concludes, as a matter of law, that Churchill breached the Operating Agreement by

4 | failing to distribute 2022 Net Cash from Operations to the Trust in accordance with the

5 | waterfall scheme.  This breach is material because it deprived the Trust of profit

6 | distributions, and "the Trust invested in Pelican to make money."  Reply at 13.

7 | Accordingly, the Trust is entitled to summary judgment on this claim.

8 | **C.    Declaratory Judgment Claim**

9 | Having determined that the Trust is entitled to partial summary judgment on its

10 | breach of contract claims, the court turns to the Trust's request for a declaratory judgment

11 | that it validly removed Churchill as Manager of Pelican by its March 29, 2023, letter to

12 | Churchill.  Mot. at 20.  Churchill opposes the Trust's request solely on the ground that

13 | there are disputed facts regarding whether Churchill breached the Operating Agreement

14 | and whether those breaches were material.  Resp. at 24-25.  The Court grants the Trust's

15 | request for declaratory judgment.

16 | Section 4.3 of the Operating Agreement authorizes the Trust to remove Churchill

17 | as Manager and elect a replacement Manager "in the event of cause."  Cause for removal

18 | exists if "[the] Manager has committed a material breach of th[e] [Operating]

19 | Agreement."  Op. Ag. § 4.3.  Because the court concludes, as a matter of law, that

20 | Churchill materially breached the Operating Agreement (*see infra*), the court also

21 | concludes that the Trust has demonstrated sufficient "cause" to remove the Manager

22 | under § 4.3.

The Operating Agreement provides procedures that must be followed to effectuate removal of the Manager.  Specifically, the Operating Agreement requires that the nonbreaching party provide the Manager "written notice . . . specifying in reasonable detail the grounds for" its proposed removal and providing the Manager an opportunity to cure the breaches.  Op. Ag. § 4.3.  On December 16, 2022, the Trust notified Churchill by letter that the Trust was invoking its right under § 4.3 to remove Churchill as Manager of Pelican.  Wendt Decl. ¶ 16, Ex. E.  That letter describes in detail the breaches addressed in the Trust's summary judgment action, among others.  On February 27, 2023, Churchill indicated that it "disagree[d] with [the] assertions" in the Trust's December 2022 letter.  *Id*. ¶ 16, Ex. F.  Churchill's response letter attached "several financial documents" but did not otherwise explain how those documents cured the breaches, nor did it provide any substantive response to the breaches.  *See id.*  On March 29, 2023, following the expiration of the cure period, the Trust sent another letter notifying Churchill that the breaches remained uncured, and that Churchill had been removed as Manager effective that date.  *Id*. ¶ 17, Ex. G.  Churchill did not respond to that letter.  *See id*. ¶ 17; *see generally* Resp.  Mr. Churchill confirmed that, "to the best of [his] knowledge, [Churchill] did not" make any changes to rectify the breaches identified in the December 2022 letter.  *See* Craig Churchill Dep. at 219:4-221:23.

Based on the foregoing, the court concludes, as a matter of law, that the Trust complied with the § 4.3 removal procedures.  Because Churchill failed to cure the breaches within the cure period, the court also concludes, as a matter of law, that the Trust validly removed Churchill as Manager of Pelican on March 29, 2023, and validly

elected Spruce Street Management, LLC, as Churchill's replacement.  Accordingly, any

actions taken by Churchill on behalf of Pelican on or after March 29, 2023, are invalid.

### IV.  CONCLUSION

For the foregoing reasons, the court **GRANTS** in part and **DENIES** in part the

Trust's motion for partial summary judgment and declaratory judgment, Dkt. 32.  The

court **GRANTS** summary judgment with respect to the Trust's loss misallocation claim

(*infra* § III.B.1), the 2023 transferred assets claim (*infra* § III.B.3), the net cash

distribution claim (*infra* § III.B.4), and the declaratory judgment claim (*infra* § III.C).

The court **DENIES** summary judgment with respect to the Trust's interest redemption

claim (*infra* § III.B.2).

Dated this 22nd day of November, 2024.

BENJAMIN H. SETTLE
United States District Judge