UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICHARD L. WENDT REVOCABLE LIVING TRUST,<br><br>      Plaintiff,<br> v.<br><br>CHURCHILL & COMPANY2 LLC,<br><br>      Defendant. | CASE NO. C23-5359<br><br>DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW |

THIS MATTER is before the Court following the March 11, 2025, bench trial on issues remaining after the Court's Order, Dkt. 55, granting in part Plaintiff Richard L. Wendt Revocable Living Trust's summary judgment motion, Dkt. 32. Consistent with that Order and the evidence and argument at trial, Court makes the following Findings of Fact and Conclusions of Law.

## I. SUMMARY

The Court's summary judgment Order summarized the case's factual and procedural background. It concluded that the plaintiff Trust was entitled to judgment as a matter of law on its claim that defendant Churchill & Company breached the parties'

February 13, 2015, Pelican Capital Limited Liability Company Operating Agreement. The trial was therefore limited to the unresolved issue of the amount of damages caused by that breach.

The Court determined that defendant Churchill materially breached the Operating Agreement in three ways:

(1) Churchill wrongfully allocated Pelican's 2021 losses to the Trust alone, instead of allocating them to "all Economic Interest Owners" pro rata, in accordance with their respective percentage interests;[1]

(2) Churchill transferred substantially all of Pelican's assets without obtaining prior approval from the Trust; and

(3) Churchill wrongfully paid itself a profit share in 2022, but did not pay a share to the Trust, despite the Trust's entitlement to 68.15% of post-Preferred Net Cash from Operations.

The damages for this third breach are not disputed. Matt Wendt testified, and (given the summary judgment order) Churchill concedes, that in 2022, Churchill paid itself $388,577—100% of the purported post-Preferred Return Net cash from operations—while the Operating Agreement required it to pay the Trust 68.15% of that amount, or $264,816. Thus, in addition to the Trust's loss misallocation damages, this breach of contract caused the Trust $264,816 in damage.

---

[1] Matt Wendt testified that the Trust's pro rata share was 50.20%. Dkt. 81 at 56 and 60.

The Court rejects as inconsistent with the contract and the evidence Churchill's post-trial claim that the venture's profit and loss must be evaluated over time, not on a yearly basis. Dkt. 85 at 13.

The Trust's contested damages for the remaining breaches are discussed below.

The parties agree that in 2021, Pelican Capital suffered a loss of $3,042,587. Trial Exhibit 13. The Court's damage calculations begin with this number. The Trust's witness Matt Wendt credibly and persuasively testified to the amount due the Trust under a loss and damage calculation consistent with that Order, and as demonstrated on plaintiff's Exhibit 33 (Dkt. 83-3 at 2). The Court therefore largely accepts Matt Wendt's testimony, and the Trust's damages calculations, with the following explanations and exceptions.

First, the Court denied the Trust's summary judgment motion on its claim that Churchill wrongfully attempted to redeem the Trust's interest in Pelican without obtaining the Trust's written approval. The Trust did not accept Churchill's redemption as a final accounting and Churchill did not present any evidence that it did. Instead, in the February 18, 2025, Pretrial Order, the Trust admitted that "Churchill treated such payment as a partial redemption of the Trust's remaining capital investment in Pelican Capital." Dkt. 59, ¶ 10. The Court concludes that the Trust abandoned any claim for damages stemming from this allegedly material breach, and there is no evidence that it caused the Trust any damage. Churchill has prevailed on this claim.

Second, Matt Wendt testified at trial, and the Trust contends, that Churchill breached the Pelican Agreement in 2021, when it paid itself $85,620, when there was no "post-Preferred Return Net cash from operations." Dkt. 82 at 5. Thus, it claims, the

1  improperly allocated Pelican "loss" for 2021 was in fact that amount more, or
2  $3,128,207. *Id.*

3  The Trust's summary judgment motion asserted a different if not necessarily
4  inconsistent claim based on this specific distribution. It argued that Churchill breached
5  the contract when it paid itself $85,620 (or 44.8%) of an "apparent" profit of $190,978,
6  while paying the Trust $105,258 (or 55.2%), because the parties' contract called instead
7  for a 31.85% / 68.15% split. Dkt. 32 at 9. The difference is less than $25,000. The
8  Court's summary judgment Order did not grant the Trust's motion on this point, and it
9  was not and is not part of the loss allocation dispute. The Court's calculations will not
10 include this payment as an additional loss in 2021.

11 Third, while Churchill's July 2022 purported "redemption" payment, $178,449, is
12 not itself actionable, the payment was made, and the Trust concedes it is properly
13 deducted from the total damages caused by Churchill's loss misallocation.

14 Finally, the Trust contends that the K-1 Churchill provided the Trust for 2022
15 showed a $728,956, "distribution" to it, when in fact the only distribution the Trust
16 received was the purported redemption, $178,499, discussed above. *See* Dkt. 81 at 67.
17 The evidence and argument about the difference, $550,457, was unclear and thus not
18 persuasive. Churchill testified that this money was "not a loss," suggesting that that
19 additional amount should have been distributed to the Trust, or that the Trust's capital
20 account should have been increased. It also contends that Matt Wendt's inclusion of this
21 amount is speculative. Dkt. 85 at 12. The Court concludes that the Trust failed to meet its
22

burden of proof on this issue, and the Court will not add this $550,457 to the Trust's "corrected" Pelican capital account.

The Trust's 2022 K-1 also showed that its capital account ending balance was $2,401,753. Exhibit 33, Dkt. 83-5 at 2. The Trust uses this baseline for its damage calculation. The Court will also do so, though it does not apply two of the Trust's proposed adjustments to it. Churchill misallocated Pelican's 2021 loss, $3,042,587 to the Trust. Using the correct, pro rata allocation, the Trust's share of this loss is 50.20% of that amount, or $1,527,379.

The Court will not add the Trust's claimed $85,620 to this amount, and it will not add the Trust's claimed $550,457 to this amount. It will credit Churchill the redemption payment of $178,449. This totals $1,348,930. The Trust's correct 2022 capital account balance is therefore $2,401,753 plus 1,348,930, which is $3,750,683. Adding the $264,816 in admittedly unpaid 2002 profit nets a total damage amount of **$4,015,499**.

Consistent with its prior Order and with these determinations on the major points, the Court makes these additional Findings of Fact and Conclusions of Law.

## II. FINDINGS OF FACT

1. In February of 2015, the Trust and Churchill & Company 2 LLC entered a limited liability company agreement (the "LLC Agreement") for Pelican Capital, LLC ("Pelican Capital"). Under the LLC Agreement, Churchill was named Manager of Pelican Capital. Admitted Fact No. 1.

2. The Trust and Churchill anticipated using Pelican Capital to make real estate loans. Admitted Fact No. 2. Because the Trust and Churchill anticipated soliciting

additional investors to participate in that lending, the Trust was named an "economic interest owner" in Pelican Capital, as would be the any anticipated additional investors. Admitted Fact No. 2.

3. After executing the LLC Agreement, Pelican Capital, through counsel, prepared and adopted a Private Placement Memorandum (the "PPM") for Pelican Capital. Admitted Fact No. 3.

4. Churchill solicited additional investors who became Class A Economic Interest Owners. Admitted Fact No. 4.

5. The LLC Agreement created two classes of investors—Class A Economic Interest Owners and Class B Economic Interest Owners. LLC Agreement § 3.1. Class A Economic Interest Owners were "entitled to [a] Preferred Return payable quarterly to the extent of available Net Cash from Operations." LLC Agreement § 3.1(a). Class B Economic Interest Owners were "entitled to a pro rata portion of Net Cash from Operations." LLC Agreement § 3.1(b).

6. The Trust contributed $6.2 million in capital to Pelican Capital as a Class B Economic Interest Owner. Admitted Fact No. 6.

7. For several years, Pelican Capital made profitable real estate loans. In 2020, Pelican Capital suffered millions of dollars in loan losses. Additionally, Pelican Capital had a dispute with the entity with which it invested and lost the related arbitration, causing additional financial harm to Pelican Capital. As a result of this dispute, Pelican Capital lost subcontracted management services and Churchill assumed full management of Pelican Capital. Admitted Fact No. 7.

8. In 2022, Churchill paid itself $388,577.42 in purported profit distributions. In 2022, Churchill paid no purported profit distributions to the Trust. Admitted Fact No. 9. Had Churchill split that profit distribution as required by the LLC Agreement, the Trust would have received **$264,816**.

9. Churchill allocated all Pelican Capital losses to the Class B Economic Interest Owners. At the time of the loss allocation, the only Class B Economic Interest Owner was the Trust. Based on Churchill's assignment of all Pelican Capital losses to the Trust, by July of 2022, Churchill caused $178,499 to be sent to the Trust on July 13, 2022, and at the time Churchill treated this payment as a redemption of the Trust's remaining capital investment in Pelican Capital. Admitted Fact No. 10. Had Churchill allocated losses according to Section 6.1(c) of the LLC Agreement, the Trust's Pelican Capital capital account would have had a balance of **$3,750,683** at the end of 2022 (after accounting for Churchill's July 13, 2020, return of $178,499 to the Trust).

10. Section 4.3 of the LLC Agreement authorizes the Trust to remove Churchill as Manager and elect a replacement Manager "in the event of cause." Cause for removal exists if "[the] Manager has committed a material breach of th[e] [LLC] Agreement."

11. On December 16, 2022, the Trust sent Churchill a notice of removal of Churchill as manager of Pelican Capital and opportunity to cure. Admitted Fact No. 11.

12. On February 27, 2023, Churchill, through counsel, responded to the Trust's notice of removal. Admitted Fact No. 12.

13. On March 29, 2023, the Trust, through counsel, sent Churchill's attorney a notice removing Churchill as Pelican Capital's manager. Admitted Fact No. 13.

1    14.    In April of 2023, Craig Churchill and Cydney Churchill formed Raven

2  Capital, LLC ("Raven").

3    15.    Between May 30 and June 13, 2023, Churchill purported to redeem the

4  Class A Economic Interest Owners' entire capital investments. To purportedly redeem

5  those Class A Economic Interest Owners' capital investments, Churchill caused money

6  that had been invested with Sound Capital to be paid to Pelican Capital. Following

7  Churchill's redemption of the Class A Economic Interest Owners' entire capital

8  investments, Pelican Capital's only asset was the contingent right to receive payments on

9  certain non-performing loans. Admitted Fact No. 14.

10    16.    Most of the Class A Economic Interest Owners' capital investments were

11  transferred to Raven. Craig Churchill and Cydney Churchill reinvested those funds in

12  Sound Capital.

### III.  CONCLUSIONS OF LAW

**A. This Court's Subject Matter Jurisdiction**

1. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a) because the Parties are citizens of different states and over $75,000 is at issue.

**B. Churchill Breached the LLC Agreement**

2. To establish a claim for breach of contract, the plaintiff must show that a contract exists, that the contract imposes a duty, that the defendant breached that duty, and that the breach proximately caused damage to the plaintiff. *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 78 Wn. App. 707, 712 (1995).

3. In interpreting contracts, Washington courts "focus[] on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503 (2005). The court assigns terms in the agreement "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* (citing *Universal/Land Constr. Co. v. City of Spokane*, 49 Wn. App. 634, 637 (1987)). If the terms of a contract are unambiguous, the court must "enforce [the contract] as written[.]" *Radliff v. Schmidt*, 27 Wn. App. 2d 205, 211 (2023). Extrinsic evidence may be used only "to determine the meaning of *specific words and terms used*" in the agreement and "not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'" *Hearst*, 154 Wn.2d at 503 (citation omitted). In other words, the court "do[es] not interpret what was intended to be written but what was written." *Id.* at 504.

4. The terms of the LLC Agreement that are relevant to the Parties' dispute are not ambiguous.

5. A breach is "material" if it "'substantially defeats' a primary function of an agreement." *224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 724 (2012).

**1. Churchill Materially Breached the LLC Agreement by Misallocating Losses[2]**

---

[2] The following conclusions are a summary of the Court's November 22, 2024, Summary Judgment Order, Dkt. 55. Nothing in these Conclusions supersedes that Order.

6. Churchill's allocation of all Pelican Capital losses to the Trust breached Section 6.1(c) of the LLC Agreement because that section required that the "net loss for any fiscal year . . . be allocated among the Economic Interest Owners pro rata in accordance with their respective Percentage Interests." Because the mechanism for allocating losses was a primary function of the LLC Agreement and because the Trust was substantially harmed by this breach of the LLC Agreement, Churchill's breach of the LLC Agreement by misallocating losses was material.

**2. Churchill Materially Breached the LLC Agreement by Transferring Substantially All of Pelican Capital's Assets out of Pelican Capital**

7. Churchill's transfer of substantially all assets from Pelican Capital breached Section 4.1 of the LLC Agreement because that section required the Trust's "prior approval" for "[t]he sale, transfer, conveyance, or other disposition of all or substantially all of [Pelican Capital]'s assets," which was not obtained from the Trust. Because the Trust negotiated to have robust management rights, including the requirement of prior approval for a transfer like that Churchill made, Churchill's breach of the LLC Agreement by transferring substantially all of Pelican Capital's assets from Pelican Capital was material.

**3. Churchill Materially Breached the LLC Agreement by Distributing the Wrong Amounts of Post-Preferred Return Net Cash from Operations to Itself**

8. Churchill's payment of more than 31.85% of post-Preferred Return Net Cash from Operations to itself in 2022 breached Section 7.1 of the LLC Agreement because under that section only 31.85% of post-Preferred Return Net Cash from Operations was

payable to the Manager. Because these payments deprived the Trust of profit distributions and the Trust invested in Pelican Capital to make money, Churchill's breach of Section 7.1 of the LLC Agreement by payment of more than 31.85% of post-Preferred Return Net Cash from Operations was material.

**C. Declaratory Judgment**

9. "[I]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[C]ase of actual controversy" refers to the types of cases and controversies that are justiciable under Article III of the United States Constitution. *MedImmune, Inc. v Genentech, Inc.*, 549 U.S. 118, 126-27 (2007). An actual controversy exists within the meaning of the Declaratory Judgment Act when the dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.* at 127.

10. The Trust and Churchill had an actual controversy regarding whether Churchill materially breached the LLC Agreement and whether the Trust removed Churchill as Manager of Pelican Capital.

11. Section 4.3 of the LLC Agreement specifies the requirements for removal of Pelican Capital's Manager. The Trust complied with all requirements of Section 4.3 of the LLC Agreement in removing Churchill as Manager of Pelican Capital. Churchill did not cure its breaches in the time permitted under Section 4.3 of the LLC Agreement. Accordingly, and as observed in the Court's Order on summary judgment, the Trust is entitled to declaratory judgment that "the Trust validly removed Churchill as Manager of

Pelican [Capital] on March 29, 2023, and validly elected Spruce Street Management, LLC, as Churchill's replacement. Accordingly, any actions taken by Churchill on behalf of Pelican [Capital] on or after March 29, 2023, are invalid."

**D. The Trust's Damages**

12. "[T]he general rule governing damages for breach of contract [is] that the aggrieved party should be put in the same economic position it would have attained had the contract been performed." *Crest Inc. v. Costco Wholesale Corp.*, 127 Wn. App. 760, 764 (2005).

**1. The Trust's Damages from Churchill's Breach of the LLC Agreement by Misallocating Losses and Transferring Substantially all of Pelican Capital's Assets to the Class A Investors without Having Properly Allocated Losses**

13. Churchill breached the LLC Agreement by allocating all losses to the Trust and none to the Class A Economic Interest Owners. *See* Conclusion of Law No. 6, *supra*. Churchill also breached the LLC Agreement by transferring substantially all of Pelican Capital's assets to the Class A Investors without having properly allocated losses. *See* Conclusion of Law No. 7, *supra*.

14. Had Churchill allocated losses according to Section 6.1(c) of the LLC Agreement, the Trust would have had capital in the amount of $3,929,132 in Pelican Capital at the end of 2022. In 2023, Churchill paid the Trust $178,449. Accordingly, the Trust is awarded **$3,750,683** in damages from Churchill's breach of Section 6.1(c) of the LLC Agreement and transfer of substantially all of Pelican Capital's assets to the Class A Investors without having properly allocated losses. Prejudgment interest on this damage

award accrues at 12% per annum from July 13, 2022. RCW 19.52.010(1); *see also Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 961 (9th Cir. 2008) ("State law generally governs awards of prejudgment interest in diversity actions.")

**2. The Trust's Damages from Churchill's Breach of the LLC Agreement**

15. Churchill breached Section 7.1 of the LLC Agreement by paying to itself more than 31.85% and paying to the Trust less than 68.15% of post-Preferred Return Net Cash from Operations to itself in 2022. *See* Conclusion of Law No. 8, *supra*.

16. Had Churchill paid the proper post-Preferred Return Net Cash from Operations to the Trust in 2022, the Trust would have received $264,815. Accordingly, the Trust is awarded post-Preferred Return Net Cash from Operations in the amount of **$264,815** for 2022, with prejudgment interest accruing at 12% per annum from December 31, 2022.

The total damage amount is therefore **$4,015,264**.

**IT IS SO ORDERED**.

Dated this 15th day of December, 2025.

_____
BENJAMIN H. SETTLE
United States District Judge